All right, next up is Amtrak against Espen Specialty Insurance Company. Good morning, Your Honor. Paul Smith for Amtrak, Appellant Amtrak. The District Court erred in granting summary judgment for Amtrak's insurers, thus precluding Amtrak from seeking any insurance coverage for the Sandy-related damage to the Hudson and East River Tunnels above and beyond the $125 million flood sublimit. Even assuming that the Sandy storm surge is properly treated as flood within the meaning of policies, Amtrak bargained for full coverage above and beyond the sublimit, the flood sublimit, for ensuing losses, even if predominantly caused by flood. And the District Court, we submit, lacked any legal basis for ruling that the chloride-induced corrosion of the steel in the tunnel, which didn't begin until days after the hurricane was over and after the inundation had been pumped out, could not be treated as an ensuing loss subject to the Ensuing Loss Clause. When you say could not be treated as ensuing loss, one thing that puzzled me a little bit, is the ensuing loss question one that, in your view, ordinarily is or should be put to a jury, such that the summary judgment or not, whether on these facts a reasonable jury could find ensuing loss, or is the ensuing loss inquiry more conceptual and legal in the first place? I'm not sure you can generalize. I think it may vary from case to case. In this case, Your Honor, our primary submission is that the judge made a legal holding that is erroneous, that somehow because this corrosion was, in Judge Rakoff's view, too foreseeable or a loss in the absence of an independent cause, somehow the New York law requires that we not be able to invoke the Ensuing Loss Clause. There also is some language in the opinion which we view as... What's the difference between proximate cause and ensuing loss? I don't think they mean the same thing. The elements of ensuing loss, Your Honor, are that it has to come later in time than the excluded or, in this case, the sublimated loss, which is flood. That seems like a harder argument for you to win on, frankly. If what you're saying is it just has to come after, first of all, that seems to me inconsistent with the New York Court of Appeals' decision in Flatech, and secondly, as a matter of de novo interpretation, it seems to undermine any exclusion to a kind of absolute degree. Most losses that are caused by something happen after the something happens as a cause, and then there's an effect that comes after. By definition. By definition. So if ensuing just means later in time, I have trouble getting that as a policy matter if I had to decide it in the first instance, and I'm not sure I do because I think the New York Court of Appeals already has decided it. Two points, obviously, Your Honor. I'm going to answer the Flatech point in a minute, but I do think there's a difference between something that happens when the event occurs, which is the flood damage that happens when water rushes in, moves debris around, maybe it causes structures to fall down, causes electrical damage because of the presence of water, and a separate chemical reaction which doesn't begin to occur until days later and is properly treated as the equivalent of a fire or an explosion that might happen later. We had wood rather than metal, and it was rotting from being wet. That, too, could be an ensuing loss. It could be, as Judge Friendly commented in the Aetna case. Rot, mold, those sorts. If it's shown that they don't begin immediately when the water's there, they only begin when there's air there, which is certainly the case with respect to— So does water hurt anything in its own right, other than the rush of water that, as you said, might flush out loose stuff in the tunnels that belongs to Amtrak so that it's never recovered again because now it's buried under the river? Sure. Water doesn't really hurt much of anything if you mop it up really fast, but if it's a flood, most people, when I think, why wouldn't I want a flood to come into my apartment? The answer is because it would ruin everything that's there because all my books would be waterlogged and all my wooden furniture would become moldy and warped, and maybe some of the metal things would rust, but you're saying none of that is actually flood damage. I think much of it is flood damage. The presence of water immediately ruins many things. Your iPhone, when you drop it in the bathtub, is ruined instantly. Papers may be ruined instantly. Photographs. Many things. In this case, there was a massive amount of damage simply by the fact that the tunnels couldn't be used for a week. There's a business interruption loss. There were things moved around by the moving of water. Flood damage of that kind is irrespective of the fact that there was chloride in the water. If this had been a flood caused by freshwater coming down river rather than saltwater coming up river, the same volume of water rushing into these tunnels, you would have had the same flood damage. We're not, under our theory, in any way negating the flood sum limit as applied to the things which are happening when there's a subsequent chemical reaction that begins because there happen to be large amounts of chloride. This chemical reaction, by the way, is continuing in those tunnels today. Just to be sure, the chloride is just because it was seawater that that's what happened as opposed to some other kind of mold that would have happened if there were freshwater rot, right? Right. Chloride as to steel, when you combine it with oxygen in humid conditions, causes a continuing reaction which goes on. It's the same reason why your car, if you have it up in snow country, lasts about half as long as it does in Florida. There's maybe more water in Florida, but there's a lot less salt on the road. But I don't understand how you can separate out the chloride damage from flood damage that occurs by saltwater. As Judge Lynch was saying, you have the initial breakage of items by the force of the water coming in, but there's no way in which the corrosion that you're describing could have been avoided in any way. It's part and parcel of the fact that it was saltwater that effectuated the flood, isn't it? Your Honor, the evidence that we're prepared to show at trial is that as long as the water had been left in the tunnels, this corrosion would never have occurred. It only starts after the oxygen is reintroduced into the tunnels. So there is the temporal delay, which is very different from the other kinds of flood damage at issue. And to go back to the issue of the plate... Corrosion would occur even if the water had remained in the tunnels. No, Your Honor. The evidence is that a metal girder sitting in seawater will never rust until the oxygen gets to it. That's what we're prepared to show. There is, in fact, a factual dispute about that. But as the District Court recognized, it was obligated to take our view of the facts. I don't understand why that makes a difference. I mean, the water comes, the water goes. There was no obligation to keep the water in the tunnel, to avoid that. So as long as you had saltwater coming in, you were going to experience that corrosion because there was metal there. Well, foreseeability... This is unlike the kind of earthquake, the fire happening after an earthquake, the San Francisco fire situation. I don't see it as different. A, the insurers have conceded that the foreseeability of the subsequent event is not relevant. Judge Rakoff, of course, thought it was. But if you look at their briefs, they don't accept his idea that any natural expected result is disqualified as an ensuing loss. They simply rely on this other idea that there has to be some new independent cause, like... A separate peril. Right. But the word peril in Playtech, Your Honor, it's important to understand in insurance law, a peril is both a causative agent and the damage. So if you look at the policy, they have excluded perils of radioactive contamination, not radioactivity, mechanical breakdown. All of these things are both. And the word peril in the Playtech case, in quoting the treatise in that one sentence, is essentially saying that it has to be something different in kind and different in time. That's what you said in the Rapid Park case, which you sat on, Your Honor. And we have a difference in time and a different in kind kind of damage. It affects different property in the tunnels than the property that was hurt by the water. In the language itself, even if the peril of flood or earthquake is the predominant cause of loss or damage, any ensuing loss or damage, not otherwise excluded herein, shall not be subject to any sublimits or aggregates specified in this Clause B. So you would argue that the peril of the flood is the predominant cause, whereas the corrosion is the ensuing loss, and therefore you're entitled to full recovery. We certainly meet the literal language. But isn't this a situation where, as in Playtech, if we took your view of it, there would be no or hardly any damage from the predominant cause of loss or damage? Not true, Your Honor. All of the things I discussed before with Judge Lynch were flood damages caused by the fact that water came in and was there. Water came in and water went out and the tunnel was operative, except that there was corrosion. The idea that somehow if the water had left chemicals behind that caused a flame as opposed to a slow-burning corrosion, somehow that should make a difference is simply inconsistent with the language of the clause. There is not a hint here of a requirement of some new immediate accidental cause, which is what the District Court relied on. And the key message of Playtech is the language of the clause is critical, that there is no pre-existing New York law requirement that is superimposed on these clauses. This is not like an indenture where the courts sort of read a fixed meaning into certain kinds of concepts. The command of the court— This is your term of art argument, but I find it hard to follow that because every case that interprets language then gets encrusted onto the language. So to the extent that a court—and maybe your argument—I understand the argument that you're making, that Playtech doesn't actually do this. But if we read Playtech as saying, here's what an ensuing loss is, then the next insurance policy to come along that uses the term ensuing loss has to be interpreted in accord with that precedent. Well, you know, Your Honor, I think it's important to understand this is an extraordinarily broad ensuing loss clause, very different from the run-of-the-mill ensuing loss clause. The one in Playtech, for example, said we don't cover water damage to your house, but we do cover fire, theft, and explosions resulting from water damage in your house. And so they had a specific requirement of some new independent cause. And there are many such examples out there in the case law, but what we bargained for was an extraordinarily broad thing that says any form of loss or damage predominantly caused by the flood. Now, if they thought that they weren't covering things like mold and corrosion caused by seawater, with that kind of a broad clause, they should have had some exclusion for it. There certainly are policies that I have seen and have come before me in my judicial capacity that have corrosion exclusions that then become the subject of other sorts of interesting litigation. I take it this one does not. No, Your Honor. There are many excluded perils in these policies. Radioactive, for example, is the one I mentioned before, but corrosion, chloride damage, none of that is excluded here as a separately excluded peril. So we meet the elements of Playtech. We have, it's subsequent in time, it's a different kind of harm, and it is not otherwise excluded under the policy. Can I just go back to my jury question or not argument? Because it does sound to me as if the consequence of your argument is that at least unless the insurers are contending or are contesting the scientific facts— They are, I think, Your Honor. They are, okay. So that would be a jury question. It would be a jury question whether your chemical theory is correct as to how the corrosion actually operates. But then it seems to me still the jury on your theory would have to be instructed that if you are right on those facts, then it is as a matter of law ensuing loss. That's our position, Your Honor. Okay. And I think that is a correct position under the governing law of New York, which says look at the policy under the language of the policy and under the evidence that we submitted about what happened here. If I might just take a minute to talk about the DICC— Yeah, I'm going to give you—I mean, there are a lot of complicated issues in this case, so I think we're going to need some more time than was originally allotted to deal with it. Well, I shouldn't say than was originally—than I originally allotted. I take responsibility for that, but I'll give you some more time for my mistake. Okay, I appreciate that, Your Honor. Okay. I mean, I think it's really important to understand that the sentence that you were pointing to in PLATEC, which is to say a new covered peril has to come along, is not something that really was intended to talk about how to add some new cause, that a peril in that context— I hear that, but what I was giving you the more time for was to talk about the DICC clause. Okay, Your Honor. So, the other—another really, I think, serious error that the District Court made here was in ruling that we don't even have potential coverage for the replacement of the undamaged portions of the bench walls and the track bed to comply with the Fire Code and with the Americans with Disabilities Act, if and when that anticipated requirement comes to fruition. We have— The FRA hasn't issued any enforcement order. If and when this case ever goes to trial, Your Honor, if it's still unright, the judge might say our request for declaratory judgment is premature, but all that happened here is they moved for summary judgment. We said we anticipate having these problems and these obligations, and Judge Rakoff said, apparently, because there hadn't yet been some obligation imposed on us, we somehow lose coverage permanently. Well, let's be—sort of try to figure that out. Suppose you're right. What is the decree that you think is appropriate from the Court? Because I don't think you're contending, or maybe you are contending, but at this moment, you're not emphasizing the argument. Are you contending that we can tell now that the DICC clause applies because we should project what the regulations say? At this moment, I'm just asking you to reverse the grant of summary judgment against us on that issue, Your Honor, and it's important to understand, the order— We'd like to know what the consequences are. Would leave open the question of whether or not, in the future, we will be able to ask the District Court to order them to— Why is Eric Case so controversial? Because we've just lost this case with prejudice on the issue. That's the with prejudice issue. And what I was wondering is, what is the difference between saying that the insurers are entitled now to the dismissal of this part of the case to not have it hanging over them, but without prejudice, to your filing a new action if as and when some regulator tells you you have to do something, and saying that this case should go forward in a kind of limbo, really, waiting for that to happen on that clause? Because as of now, it sounds to me like you just conceded that you are not today entitled to a declaratory judgment that they have to pay something, or they have to pay specifically for the reconstruction of the entire tunnel. Well, I think that the prospect that we're going to have to do that is sufficiently clear under the ADA and under the other regulations that apply that you could come to that conclusion, but I'm not asking you to do that this morning. Well, I mean, again, there's a question of what the law is, or what the interpretation of the contract is. The insurers might be taking the position that the DICC clause doesn't come into play until some regulator tells you what you must do. It seems to me there's also a possible argument that – there are so many arguments here, I'm not sure exactly which ones you made, forgive me. There's also a possible argument that, well, at least in some cases, on some states of some records, you would be able to say, wait, we have to wait for somebody to come and tell us that there's something that we obviously are required to do as a matter of law? That has to be right. I think we think that has to be right, but whether this is that case is a more complicated question. But I think at this point, we didn't ask for anybody to rule at this stage. We were finishing up discovery, getting the case put together. We put in evidence that showed our engineers anticipate having to put the lower benchmalls in and the flat track bed in, and that is the plan that they are developing and will soon be submitting for funding. What they want to do is do the work before they get an order. Well, do you want to do the work, or is the idea that you're going to submit plans to do the work and then some regulator is going to tell you that's not good enough because you have to do more or something like that? The way this works, Your Honor, is the Federal Railroad Administration is the administrator of the federal grants that will pay every dime of this work, and they have extraordinarily detailed review of all the plans, and the idea that they would allow us to only put the floor-level benchmalls up to a certain point and then they'd have a barrier where people couldn't get off the benchmalls and get out of the tunnel is, I submit, quite fanciful. But at that point, there will be a whole discussion of all of this in great detail with our regulators, and we're quite confident at the end of the day between the ADA and the fire code that that's what's going to be required and that in the end of the day, we will have this. So what you want is for us to say the summary judgment is reversed because it is premature to conclude that they win as a matter of law, period, full stop, or at most to then say this issue could reemerge at some future stage in the case? Right. We're dealing with an order here. This is page five of the special appendix. It says that this clause does not provide coverage for the portions of the benchmalls and trackbed not damaged by superstorm Sandy. That is a problem for us because it is a holding that will be binding. Right, because it is with French. Why did you bring the lawsuit before you had to? We brought the lawsuit, Your Honor, for a whole variety of reasons, including a declaration that the ensuing loss clause applies, that it's not a flood. We're asking the District Court to give you an advisory opinion. No, Your Honor. On those issues, we were asking... On this particular issue. Well, if you look at the complaint, this issue doesn't show up in the complaint. It shows up in the middle of the litigation, and it's an anticipated additional... All that the complaint says is, we have a lot of reasons why we think we're not stuck with $125 million flood limit. That's what it says. Then this kind of emerges in the middle of the litigation. We would have, presumably, by the time this case got to trial, been able to make additional evidentiary arguments about how much we were going to have to be required to comply with these things. At this point... I mean, I understand, and we'll have to work out, I understand your argument, we'll have to work all this out at some point. But as a practical matter, I think what you're hearing is a lot of concern about how this issue should be technically handled, but also a lot of agreement with you that it's hard to see how it can be set as a matter of law until the regulators act, at least, that you have to lose on this clause. On that basis, perhaps, I'm leaving it. Having got that far, maybe I should let the other side speak. Maybe you're going to have to come back to our rebuttal when they have very good arguments on the other side, but we'll hear them in due course. Thank you. Thank you very much. May it please the Court, Doug Hallward-Drehenmeyer on behalf of the excess insurer at Paliz. Can you give me some indication, I take it two of you are going to argue, as to how that can be divided up? Your Honor, each of us was prepared to address all issues, and there are common issues among us. There are some policy wording differences, but I think we're each able to address questions as to any of the issues. Oh, okay. But I'm sorry, what the clerk gave me had both counsel representing Aspen, but I take that's not quite right, or they're different? You're Aspen, and you represent whom? We represent partner reinsurance, tourist specialty. Okay, so different insurance companies with your different policies, that's why it's divided up. Exactly, yeah. Okay. Go ahead. Okay. Good. That's helpful to know. Thank you very much. So I will start with ensuing loss, but I also have some comments I'd like to make on DICC. With respect to ensuing loss, I think one of the things I was sensing in the questions is a recognition that this is an issue that cuts both ways, that if you were a homeowner and have purchased flood insurance, you would think that you had insurance that would cover, when your house was inundated with saltwater, the corrosion that occurred as a consequence of the saltwater where it wasn't supposed to be. This is flood damage, and that's not what the ensuing loss provision is designed to cover. The ensuing loss provision provides that even though this loss may be excluded in some policies, or in this policy, there is actually coverage for flood, but it's limited at $125 million, if as a consequence of that excluded or sublimited peril, another peril arises, and that peril causes damage, you're going to get the benefit of that. And of course, the classic example is the San Francisco earthquake, where if you had an earthquake exclusion, but you had fire insurance, after the earthquake, with all the gas lines broken, there were lots and lots of fires. And if your house burned, the insurer wasn't supposed to be able to get off the hook by saying, yeah, but that fire is the consequence of earthquake. The homeowner rightly said, but I have fire insurance, and that's the peril that I bought insurance of, and that's what destroyed my house. And that's what the ensuing loss provisions are supposed to do. And the Playtech decision, which is... Intervening costs. Well, it doesn't have to be an intervening cause. They're certainly related concepts. Playtech argues intervening costs. Playtech describes it in very similar terms, Your Honor. It doesn't have to be an intervening cause because, again, it can be, certainly as a causal relationship, the fires... But the question is, as foreseeable as the corrosion that occurred here? Yes, exactly. And if it was, then why isn't it still... But in the San Francisco fire case, the fire was treated as a covered ensuing loss. Why wouldn't the corrosion here be similarly treated? Because the fire is the separate peril that is purchased, that insurance is purchased. Here the corrosion is the flood loss. And this was what the district court said, and this is at SA 28. One aspect of the flood of brackish seawater, the inundation of salt, has left behind and caused damage. It's the flood that is causing this damage. Now, this policy is not... Doesn't use the word... So the entry of oxygen is not another peril. The entry of oxygen is not another peril. No other peril. That's right, Your Honor. Entry of oxygen is... That would be the touchstone of ensuing cause, another peril? Another peril, yes. Why shouldn't the policy have said that? Well, because, Your Honor, in PLATEC, the court recognized that ensuing loss provisions use various formulations, but they have a similar meaning and they're construed similarly. In fact, PLATEC itself didn't use the phrase ensuing loss at all, but the court recognized it as an ensuing loss provision. And so the word ensuing loss has been construed, as Your Honor indicated, the courts have looked at this and over the years construed it in a way. PLATEC cites to treatise, it cites to an article, it cites to decisions of other courts that indicate that New York law is consistent with that. And ensuing loss provisions are construed in a way to ensure that the exception does not swallow the rule. And in this instance, Amtrak's argument, the exception would swallow the rule. And again, I think the suggestion that someone who had purchased flood insurance would be told by an insurance company, I'm sorry, you only have flood insurance, you don't have chloride attack insurance, therefore you're not covered, would, I think the insurance company would not only be laughed out, we would be sanctioned for having acted in bad faith. Is corrosion insurance apparel that you can insure against? Well, in this particular policy, it doesn't use the word corrosion, but there is a provision of the policy that says, that excludes gradual deterioration. I was wondering about that. So if the steel girders just over time, rust, some rock and roller I think said rust never sleeps. So if it just rusts, they're not covered for that because this is, maybe I'm speaking in two broad strokes, but basically this is accident insurance and that's not kind of an incident, that's just what happens in the world. That's right, your honor. This corrosion is the result of an accident in the form of the flood is what your position is. Yes, your honor. This salt is there, this is not. The theory of coverage is that this is not gradual corrosion, this is gradual deterioration, this is the fortuitous event of the flood, deposits salt where it's not supposed to be, would not naturally occur. And it's the flood that does that. And the suggestion somehow that they're separate because the dewatering acts as sort of the And I read that immediately in my mind that suggested that if you have a house and your first floor is inundated as well as your basement and the first floor water recedes naturally but you have to pump the water out of the basement, you may have coverage for the corrosion on the first floor but not the bottom basement because you had to pump the water out for that. And that doesn't make any sense. Insurance policies are supposed to be construed in a fashion that makes sense. And so under the principles that are articulated in Playtech where you have to construe it in a way that the exception doesn't swallow the rule, that you construe it in a way that although Playtech doesn't use exactly the phrase separate and independent, they use those concepts. They note that cases disallow coverage for ensuing loss directly related to the original excluded risk and certainly corrosion in this case is directly related to the flood. They use the phrase wholly separate in citing another case, that's at page 694. And then they cite a treatise that ensuing loss provisions, quote, provide coverage when as a result of an excluded peril or in this case a limited peril, a covered peril arises and causes damage. So all of those same concepts of separate and independent are evident in New York law as recent as last year in the Playtech decision. So the district court's application of that law was correct. If I could just very briefly address the DICC. And I think what's left unsaid at all is that this argument that the DICC provides separate coverage above and beyond the limits of flood loss is an argument that was not made in the district court. It was not addressed or ruled on in the district court and it has been waived. In the district court's order, the operative . . . Why was everybody . . . but the issue was addressed as to whether the . . . how the DICC clause applied. It was, Your Honor. Why was that raised? Was it not because of the flood limit and whether the excess insurers were going to be in it or not? No, Your Honor. That issue was still in the case because the primary insurers had not yet settled. And in fact, what I wanted to draw . . . The district court addressed it, numbers of pages, starting on page 34. Yes. That's because the primary insurers . . . Because the primaries . . . . . . were in the issue. . . . were still there. And what I wanted to point out, Your Honor . . . Well, so then why is this even here at all? It shouldn't be. Then both sides are in agreement because Mr. Smith said the same thing. He said he didn't raise the DICC thing. That's part of the summary judgment motion. I'm speaking about something different, Your Honor. The theory that they have, which they really haven't briefed . . . that's not been briefed here in this court. It wasn't briefed in the district court. They have a theory that even if flood is capped at 125 and they're paid out the maximum of their primary coverage . . . They paid a separate premium, in effect, or part of the premium was calculated on the grounds that the DICC coverage is different because that's not loss that's caused by floods at all. That's loss that is caused by the regulators coming in and saying you have to fix things that the flood didn't damage. And so on that theory, this policy has an absolute exclusion for terrorism.  On that theory, if there was a terrorist attack, they'd say, well, we don't get any loss . . . any coverage for terrorism, but we have to rebuild what was destroyed by the terrorist attack and we get $125 million to do so because FRA has told us that we have to rebuild it in a certain way. But here there is coverage for flood damage, but . . . That's covered up to $125 million. Why is it reasonable to look at the DICC as building on the predicate of the flood damage? Because . . . It's not subject to the cap. Your Honor, this issue hasn't been briefed because it wasn't argued below, it wasn't ruled on below. If it hasn't been briefed, then you're not here saying that we should make some kind of ruling that this is not . . . that this is subject to the flood cap. You're saying this issue is not in this case at this moment and doesn't it therefore follow that Mr. Smith is effectively right, that Judge Rakoff shouldn't have been ruling on this one way or the other, that whether the DICC clause applies to anything they want to do is something that will have to be adjudicated in the future if, as, and when, they have a factual predicate for making such a claim? No, Your Honor, and I wanted to point the Court to page SA5, which is page 2 of the District Court's June 24th order. The June 24th order is really two separate orders. It's at the back of the blue . . . So page 2, it says, first, addressing . . . this is addressing that the excess insurer's motion to dismiss as to them. They said, first, the flood definition covers this. This was flood. Second, ensuing loss doesn't extend it because the corrosion is part of the flood. And third, there's only one occurrence, so there's only 125. And accordingly, the Court grants the defendant's motion for summary judgment and dismisses from the action the excess insurers. That's because we had said we have no obligation in this case if we show A, B, and C, flood, no ensuing loss, single occurrence. And not once did Amtrak argue, no, no, you would still be on the hook, excess insurers, because of DICC. They didn't make that argument, and therefore, Judge Rakoff dismissed the excess insurers before proceeding in the next paragraph to address the then still live issue as to the primary insurers of the coverage of DICC. And when . . . And why was the relationship of the excess and the primaries different with respect to the DICC clause? Because the primaries, they still hadn't articulated all of their forms of damage. They have certainly some damage that they had already known. They had dewatering. They had debris removal. They had electrical equipment that had, you know, been ruined by the water. But there was some question about, even up to the 125, would they be entitled to . . . $125 million of obligation for the damage portion, and Judge Rakoff concluded the possibility of additional damage for the . . . additional obligation for the undamaged portion. No, that's not right, Your Honor. Judge Rakoff didn't address this . . . It's $125 million, the cap for all . . . Yes, Your Honor. . . . including the undamaged portion of the . . . Yes, because the policy, the DICC clause starts with, in the event of loss or damage under this policy. So, it has to be covered loss in order to . . . and then you can get up to $125 for DICC. Judge Rakoff had decided the other way on the DICC portion. Do you mean to say that $125 million was necessary to repair the damaged portion of the tunnel, that there'd be no money left for the undamaged portion? That's right, Your Honor, because they did not raise this. In fact, when Amtrak came back and made a motion to reconsider and said, wait, wait, wait, wait, you acted too early in dismissing the excess insurers because we have another theory whereby they might be liable. They said, wind. They didn't say DICC in that motion. They said, wind. We have another theory where they might be liable. And Judge Rakoff, in footnote 10 of his opinion, and this is at page SA30, footnote 10, said, no, no, this is too late. This is too late. The excess insurers made explicit that if they went on three things, flood, ensuing loss, occurrence, they were out. And you didn't say anything to the contrary. It's too late to come back now with additional theories of how you reach the excess insurers. And he refused that motion for reconsideration on that point. But even at that point, they didn't assert that DICC was a basis for denying the motion for dismissal. And so what you are distinguishing is the question of what does the DICC clause mean, what does it cover, from the question of whether it is a separate insurance policy or a separate insurance against DICC-type losses or just a part of the limitations. Whatever it covers. So if you had fire, fire is up to 675, but you couldn't get more than 125 of that 675 for DICC, right? So you're saying that that latter question is the one that is waived. Waived. They did not waive, in your view, the argument, which, as you're saying, doesn't really apply to you, the argument as to what the DICC clause means. That was litigated. But it's not just that it was litigated by someone else or asserted by someone else. It's that you have a different issue, which they did not raise, or a different premise that they did not attack. That's right, Your Honor. I think I have that. And on the question of DICC— We'll hear from Mr. Smith his views on it, but I think I understand your argument. And on the question of the scope of the DICC coverage, I would just say that in their complaint, they actually say, and we are entitled to destroy and rebuild our seawalls from portal to portal, even though it's just this part in the middle that was damaged. All of it we're entitled to. And so, given that they had sued us for that, we were two weeks from trial. It was incumbent on them to come forward with evidence that the law would actually require that. And there's nothing. They don't even cite—they certainly don't quote, but they don't even cite to the NFPA 130 because it doesn't say that you have to destroy something that isn't. I hear that, but even if you're two weeks away from trial and even if they can't win this then, surely it's a fact that if other damage turns up at some future point, they're not precluded from seeking coverage for that. I think they are as to the excess insurers because we want a motion to dismiss. Thank you. All right. Thank you. Let's hear from Mr. Suriano. Well, you know, you better speak from there because no one in the audience will hear you. The tape that you're eventually going to want to consult about the oral argument, you need to look at. I'm sorry. Are you all right? I'm sorry. I didn't realize you were going to have difficulty getting there, but—so I apologize. I apologize for that. That's okay, Judge. In order to have the transcript or the recording of this on the website, you have to speak in the microphone. I think that my colleague has articulated almost everything that I wanted to point out, so I will not repeat. I will just say a few things regarding, number one, the actual inundation here is to less than a third of the length of these bench walls and rail. So the only way that we could get to DICC is if this court reverses the findings of the district court below that this is flood and that the ensuing loss doesn't apply. In that instance, and I won't go into the waiver argument on the so-called stacking issue. I think the court has intuited our position. With respect to the DICC in and of itself, it says, again, that's assuming that the judges ruling that the flood sublimit caps all damage, everything, but let's indulge the assumption. It says, in the event of loss or damage under this policy that causes the enforcement, I believe in session today, that they have nothing to show from FRA or any entity of a governmental nature that would apply to the undamaged portion. What about just their obligations to comply with the Americans with Disabilities Act? Those obligations as a matter of law have been ruled upon by Judge Rakoff appropriately because the ADA does not reach undamaged property. It talks about damage to facilities or alteration to facilities or part of facilities. Why wouldn't this be akin to an alteration to a facility if they have rebuilt the bench wall at a lower height? It makes it impassable for someone with a walking disability to get through. That's the condition that it probably is in now. But if there's an alteration to damaged property, then I can understand how the ADA might apply. Why is it a part of a facility? It's not part of a facility in the context of, I'm sorry, it depends upon what the it is. Sorry. Yes, there's damage to a part of the facility, the facility being the tunnel. And that could be repaired? That could be repaired. And to the extent, but for the cap on the portion of the policy that caps their damages already and they've been paid for, that's possible. But what we're saying is that the vast majority of what Amtrak is seeking, something akin to $689 million as of the time of trial, although the numbers were changing and morphing all the time. They have a request for direct fixation, which they never did before, and the record will show even after, which is in the head of their, it would be nice, their experts said, if they could get direct fixation. And they said, well, the ADA someday somehow may be enforced against us. But that's not what this policy requires. What you're arguing is in a way to split the cause of action. No, they had their opportunity, Judge. They brought this lawsuit. Let's take away the issue of waiver. Not waiver, Judge. I'm not arguing waiver on that. They raised TICC per se as opposed to stacking, which is a separate issue. We say waiver as to the stacking. We don't say that they- What do you mean by stacking? Well, they say that they could hit the limits twice in the parlance of insurance. They're saying that they could get an extra, no matter what happens, they could get an extra $125. I want to ask you about that. So under paragraph D of the policy, you have the $125 million limitation. With respect to the perils of flood and earthquake, there's a limitation of $125 million. Then in a separate clause, paragraph 8, coverage extensions, is the demolition and increased cost of construction. Why should we rule that the $125 million limitation covers both the peril and the extension? Because that's how the policy is written. If we look at the totality of the policy and the limits on the front page, that $125 million, as the district court, in our view, correctly ruled, applies across the board. An extension isn't really an expansion or extension. That's right. Does that mean also that defense costs, that's under paragraph A. It's debris removal, expediting expense, loss adjustment. Defense costs, as well as the DICC, all gone. It's all gone, Your Honor, because of the ruling, in our view, correct ruling, that the flood sublimit caps it. I thought you were saying that that's all apparent on the front page of the policy. The policy supervises. Is that right? That's right. So we get to the DICC only if there's money left over for the $125 million and there's not. That's right. It's all gone. It's all been used up. Thank you. All right. Thank you very much. All right. First, a quick comment back on the ensuing loss thing, Your Honor. Okay. I'm sorry. We're going to take just a two-minute adjournment and we'll be right back to you. Oh, I'm sorry. He's got to reply.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Go ahead. Mr. Howard-Driemeier says it's the flood that is causing this damage and somehow that thinks that disposes of our ensuing loss argument. That is an element of our ensuing loss argument. The clause says an ensuing loss is predominantly caused by flood. And so the quick— If we affirm on ensuing loss, we never get to DICC. That's not correct, Your Honor. We took the position in the district court that the DICC creates a separate $125 million coverage. We took that expressly in our brief in the district court on the DICC issue. That's— That's on the DICC issue, but this is the question of whether that is separate coverage, in effect, with a separate limit or whether it is subject—putting aside the question of whether the DICC clause covers the thing that you—the problem you have, they're saying there's a separate issue, which is whether the DICC is still subject to the overall limit of flood damage. Right. And he's asking, where did you raise that? That was in footnote 13 of our brief, opposing their motion for summary judgment on bench walls and track bed. Their argument on waiver is simply that we had an obligation not only to make that argument in the DICC brief, but in the simultaneously filed opposition to the flood brief. That somehow by not cross-referencing these two motions, which were being briefed in parallel—briefed on the same schedule, argued on the same schedule, decided in the same order—that somehow by not telling Judge Rakoff in our flood brief that we had an additional argument over here on the DICC side for getting out from under the sublimit, we somehow waived the dismissal of the excess carriers once he ruled on the flood issues. Are you saying, in effect, almost that they're the ones who waived because they didn't alert Judge Rakoff to the fact that the DICC clause issue has a separate application to them or something like that? They say, they said, we win if we establish three things, and you didn't say, oh no, no, because the thing in the other brief actually applies to you as well. They said that there were briefs about why we were wrong about the flood sublimit and why we're wrong about the ensuing loss clause, and there were briefs about why we're wrong about the DICC clause, which is to say on whether or not there's evidence of it being triggered. The only reference in the briefing to whether or not these are stacked sublimits or the same sublimit was in our brief, and we told Judge Rakoff, and it's quoted on page 20 of the reply brief, assuming arguendo that defendant's words prevail on both the flood sublimit defense and the ensuing loss defense, defendant's policies still do not contain any anti-stacking language or other provision which would bar the application of multiple sublimits. So we took that position, we preserved that position. Judge Rakoff never addressed that argument. It has not been decided contrary to what you were told. The idea that somehow you would affirm on the basis that in fact there's no separate sublimit is just wrong because it was never really briefed in the district court, it was never really briefed here, but it was not waived. I mean, we told the judge at the time in the brief where that was the relevant issue. For us to have addressed it in the other brief, filed the same day, would have been odd. How do we get to the point of having a separate $125 million limit? Our position, Your Honor, is that when you have a provision like a coverage extension like this with $125 million of coverage for undamaged property, and the policy is silent on the question of whether or not that coverage is also subject to other sublimits, that it's the insurers who lose, and that they have an obligation as insurers. So would you take that position as to each of the coverage extensions limited, that defense costs are also separate, fire brigade charges, loss to judgment expenses, debris removal, those consequential loss, control of damaged merchandise. I mean, there are a bunch of things that appear under coverage extensions, which I don't see quick after scanning quickly, any distinction between all of them. You and I are both, I think, scanning quickly here together, Your Honor. I'm hesitant to get too deep into the weeds of an argument here that has never been briefed, either in the district court or in this court. But I think I'm just following up on what Judge Hellerstein was saying, that it's really not apparent in any, it's not apparent in any obvious way that this, in fact, was not subject to the limits that are currently set forth here. Ultimately, the question, I think, is the way this is going to turn out is who has an obligation to make that clear, and I think it's a general matter of insurance law. It's the insurance company. If they want to say, this isn't really a coverage extension, it's simply a different way to get to the 125 sublimit. But I think the insured has the initial burden of showing coverage, and then, you know, it shifts from exclusions, and then exceptions to exclusions, and so on, I'm not sure. To the extent there's an ambiguity here, I think it cuts against them. They're the authors of the policies. Most of the policies recite that, as a matter of fact. If I could also, the idea that Judge Rakoff was correct. I just don't follow that. The consequence of the flood is money that has to be spent to fix up the tunnel, including money that has to be fixed up because law requires an extension into the undamaged portion. It's all part of the proximate cause, and there's $125 million of coverage that's available for all aspects of this, and I don't see any separate provision that provides a different limit for the extension of coverage. It's all part of the same thing. If you would have argued that there is no limit, that the sky is the limit on the extensions, you'd have a more logical argument, but you can't say that there's another $125 million involved because it doesn't say so in the policy. Well, Your Honor, there is a separate sublimit for the coverage extension on the DICC clause of $125 million. The question is whether or not that's a separate pool of coverage that we can invoke, even when the floods has been, as to the damaged property, the flood sublimit has been exhausted. And I think that there is no clear provision precluding that, and it's a question then of insurance law. Who has a right, who has an obligation to make that clear? And I think if and when we had an opportunity to fully brief this issue, I think there would be ample precedent showing that it's in this context where the insurance company has left that unstated, they shouldn't be able to get out from under that. Again, it's not an issue, though, that's really before the court, I think, as a meaningful matter. This issue ought to be sent back. Do you think they'll bring it to Judge Rakoff's attention that he made a judgment where no one had asked him for a judgment? Your Honor, did we, in some sort of rehearing, bring this issue back? You didn't move for rehearing. We didn't move for rehearing on this issue, no, Your Honor. No, we didn't. The first time you're making this argument is here. We made it in the original briefing to Judge Rakoff, which he implicitly rejected, I guess, but he never analyzed the issue. In other words, you're saying Judge Rakoff ruled on the substance of the DICC because he was asked to do that in the litigation by the primary insurer. By all of the insurers, importantly, Your Honor. The excess insurers fully joined in that motion, made no qualification about it. They understood that they might be on the hook for coverage above and beyond the 125. They wanted to get rid of it on this other basis. Can you further point to the footnote in the brief, or maybe it's not a footnote. No, it is a footnote. It is a footnote, Your Honor. A footnote in the brief. You referred to that on page 20 of your reply brief as to what you pointed out in the underlying briefing about the so-called stacking. That's correct, Your Honor. That's the place where it was discussed. There was some suggestion that somehow the ADA could properly be interpreted here as requiring, as allowing us to leave the old bench walls in place just above the flood level. I submit that as a matter of the merits of the ADA, if you look at what that analysis shows, it really makes no sense. The tunnel is a facility, and if you have to fix a large portion of the facility to make it accessible, which the ADA requires, we're going to be, as a matter, be required to continue so that people aren't running up against a 16-inch barrier that they can't get past with their wheelchairs. The district court seemed quite anxious to get to the result that this case was over, frankly, and that analysis of the regulation with respect to the definition of the term facility at least makes no sense to us. I think maybe there will be a time when it can be more fully developed as we have these things reviewed by the administrator of the Federal Railway Administration, but you could certainly defer that issue, but you shouldn't affirm the rejection of the ADA claim on that flimsy basis, Your Honor. To help me have a picture of things, I'm not sure how relevant it is, and please tell me if these are contested facts, I had sort of the impression that the entire tunnels were underwater, but that the bench walls were not necessarily damaged in certain portions of it. Mr. Suriano suggested that the water really only, it may flow through, but it collects only in the lowest part of the tunnel? Of course, the tunnels are lowest in the middle, and the water came in from one end, and so from that end it would flow down, but in the end, in the East River, in the lowest part, the water was up to the ceiling, but there were still places where the water was above that level on either end of the tunnel. In the Hudson River, the water was up to the top of the bench walls, so there were hundreds of yards of bench walls in both tunnels which were underwater, and then the salt seeped into the concrete of these hundred-year-old bench walls, and is still in there, causing the corrosion. That answers my question, and it also answers the other question I was going to ask, which I assumed, that the water gets into the tunnel via the land, basically, the water comes up and then- Yes. It was on the Manhattan side on the Hudson River over behind Penn Station, and then it was on the Queens side on the East River Tunnel. There's no breach of the tunnel itself from the river side, it's the water flows onto the land and flows- Where the trains go in, the water- We'd have a lot more trouble if there had been a breach of the tunnel directly from the river. Okay. Right. No, there was some- Okay, so what other issues do you want to raise? I want to just quickly mention this issue of gradual deterioration and the comparison to what we're talking about here, to sort of run-of-the-mill rust that metal components have. These are bench walls that have been there for a hundred years. These tunnels have never been flooded like this in a hundred years until this happens, and the corrosion that we're talking about is not just routine surface rust, it is a process of chemical corrosion which continues because of the presence of the chloride along with the air to eat away at these things to the point where they will continue to be gradually destroyed and will have to be replaced. No one was replacing these bench walls until the salt got inside the concrete and attached itself to the metal components inside it, and started a process of destruction which is continuing. And so I don't think that it's fair to compare what happened here to sort of normal wear and tear or somehow that this is a trivial matter. It's simply not, and it's going to cause- It's not trivial. It's a question of whether corrosion is a process that is a peril that's covered by the policy, and I think they would argue you're trying to have it in effect both ways by saying, well, it's not really like regular corrosion because it's caused by the flood, but it's ensuing loss, so we're not going to attribute it to the flood. But it is attributable to the flood. Ensuing loss is not caused by the flood. It has to be predominantly- Predominantly caused by the flood. That's what's- But then by a separate process which is a process that is covered under the policy. Yes. I don't think they've ever argued that corrosion is excluded or that this particular kind of deterioration is excluded. I have not heard about the gradual deterioration before, but I don't think that's an argument at issue, certainly not in these briefs. I think we have the arguments very well ably argued both in the briefs and here by all parties will reserve decision. And now we will take a very brief adjournment. We should be back in just five minutes or less. Thank you.